I'll turn to JTH Tax. Thank you, Mr. President. Good morning, Your Honors, and may it please the Court. My name is Matt Nicholson from the law firm of Williams & Connolly, and I represent the appellant JTH Tax, also known as Liberty. In this case, the District Court abused its discretion by denying Liberty's motion for a preliminary injunction against its former franchisee, Alexia Agnant. It's undisputed here that Agnant is in breach of her post-termination obligations, including her covenant not to compete. Specifically, she's operating a competing rocket tax business at the locations of her former franchises, and she admits that she continues to serve Liberty customers and gain new customers as well. In similar circumstances, courts around the country have enjoined former franchisees from breaching their covenants not to compete. In this case, however, the District Court declined to enjoin Ms. Agnant, and we submit abused its discretion in doing so. Now, the Court first abused its discretion on the issue of irreparable harm. As this Court recognized in the Singus case, courts generally hold that where a former franchisee breaches a reasonable covenant not to compete, it inflicts irreparable harm on the franchisor by both interfering with its customer relationships and eroding its goodwill. And, Your Honor, that principle applies with full force here. Ms. Agnant already is interfering with Liberty's customer relationships. She is also eroding its goodwill by operating from the same locations of her former Liberty franchises. Indeed, some of these locations have been there more than 10 years before she even purchased them. If Liberty is denied the opportunity to operate from these locations, it will lose all the goodwill and customer loyalty that's been built up with those locations over the past decade. Now, here, the District Court acknowledged that Agnant was, in fact, serving Liberty's customers from her former franchises, but the Court held that that was not enough to establish irreparable harm, and we think the Court erred in that holding. Specifically, the Court committed a few errors here. One, it reasoned that by terminating the agreements here, Liberty had ended its relationships with the customers. But, Your Honor, I think that ignores the fact that there is a contract here with post-termination provisions, and the very point of those provisions is to allow Liberty to continue serving its customers. Agnant is obligated to turn over her leases for these locations to Liberty. She's obligated to turn over her franchise phone numbers, emails. She's obligated to turn over the customer files, and the point of that is to allow Liberty to continue serving the customers by establishing a new franchisee in those locations or by establishing a company store. But the District Court here, I think, further erred by saying that, faulting Liberty for not presenting evidence that it intended to immediately open those company stores or that prospective franchisees were imminently seeking to enter the local market. But I think that sort of hype… Are you suggesting that there is case law binding on us that holds that as a matter of law, a franchisee who does not comply with these type of obligations, automatically, that involves irreparable harm? No, Your Honor, it's not an automatic rule. So if there were facts in a particular case that suggested that under these particular circumstances, whatever they might be, there really isn't harm. That's not automatically reversible error just to say that. You're correct, Your Honor. So this is really a factual determination. Yes. So there's not really, as I read it, a ruling by the District Court that if a franchisee, a franchisor does not have someone on hand ready to take over, automatically there is no irreparable injury. That's just one of the facts that the Court considered, maybe the principal fact, in determining this inherently factual dispute. You're just saying… What you're really saying is it's clearly erroneous determination by the judge because there really is… This does not really undermine whatever general assumption we make that there is irreparable loss in these circumstances. No, Your Honor, I don't think we're challenging any factual finding as being clearly erroneous. I think here the… So you're at least accepting that you're not challenging the factual finding that you did not have someone lined up ready to go in. You're saying that it is an erroneous decision by the district judge that that circumstance, taken all in all in light of whatever other history there is in this case, defeats the assumption of irreparable loss. Yes, Your Honor, I think that's a correct way to describe it. We're contesting the legal significance of that. Yes, we didn't have evidence that there were prospective franchisees lined up to come into these particular neighborhoods, but I think this Court should recognize when a former franchisee continues to compete in the local area and when she continues to occupy those franchises, you're going to have a problem finding new franchisees to come. At any rate, you could operate these stores yourself. We could if she were to comply with her obligations, which is to give us leases back, but she's not doing that. So in that sense, what you're suggesting is that the fact of not having another franchisee or potential franchisee already lined up is effectively irrelevant to this determination because, among other things, if she got out, you could run the business yourself for a while, maintain your position in Brooklyn, waiting for somebody better than Agnot to come along and take over as a franchisee. Yes, Your Honor, I don't think it matters that there's no prospective franchisee lined up because, like you say, we could take over the store, operate a company store, and we pleaded in the verified complaint that she was preventing us from doing that by not turning over the leases. Could you get to the merits issue rather than the irreparable injury issue? Is it a defense on the merits that I really didn't breach anything, I didn't do anything illegal or submit any false tax returns, that essentially I think Agnot's defense here was that, as a factual matter, all of these defects that were found in the audits are sort of Mickey Mouse. We didn't check the box on the form that don't really matter. Now, that would be a factual determination, would it not? Yes, Your Honor, I think that she could contest that she didn't commit any breach. Your predecessor counsel below put the case this way on page, appendix 359, transcript page 29. Basically what she's asking is, you should believe me rather than the head of compliance and the verified complaint, which is verified, you know, by a fairly high-ranking executive at Liberty. And she's asking you to say that they're wrong, notwithstanding that the head of compliance is specially trained in this. If that's the issue, isn't this just a credibility determination? You may say it was wrong. You're saying it's clearly erroneous that she believed Agnot's version, that this was all Mickey Mouse nonsense and not really a violation? Well, first of all, Your Honor, we did submit a declaration from that vice president. Yeah, I understand. Okay, wait. I didn't say there was no declaration. Of course there's a declaration. Sure. What she's asking is, you should believe me rather than the head of compliance, the man who made the declaration. And I don't think Agnot contested the fact that there were actual errors. She admitted that only some of the returns were prepared correctly. Well, there are actual errors, but she says they're not so important. And one of the problems that I had myself with the declaration is that it's not so clear whether what is being said is that these errors were violations of the law or made the tax returns inaccurate or were the failure to submit required forms to the IRS, but were breaches of your policies. Now, it seems to me that there may be a provision in the contract that would say that's good enough to terminate, but the way this case seems to have been presented below was there are false tax returns. There are things that the IRS would charge penalties for. And then there are things like, as examples, and I'm now looking at the paragraph 14 of the declaration of Mr. Delaney, the Schedule C violation, which is what we've heard most about in the proceedings below, was no proof of business existence. As it happens, I mean, I file Schedule C because my wife has a business. There's nothing that says – I've never been asked or read the forms or TurboTaxes and tell me that I have to file a proof of business existence. Well, we say here's how much money she made, here are the expenses. Yes, you're right. So what is a proof of business existence, for example? I take your point, but there are specific requirements in federal law that apply to tax preparation services. So in this example you're giving, it would be a violation of 6694 of the Internal Revenue Code because you would be taking an unreasonable position as a tax preparer that results in an understatement of liability. Here, if you're claiming for the taxpayer that he or she has business income or business expenses with no verification that the business even exists. And what is required as proof of business existence? A man comes into the store and says, here's what I do. I basically do odd jobs, construction-type, repair-type things to people in the community, and they pay me. And being an honest person, I don't take advantage of what an IRS agent once told me was Section 2 of the Code, cash doesn't count. I don't just take the cash and run. I want to put it on my tax return and pay whatever I'm supposed to pay. And here's how much money I got paid for these various jobs. What is the documentation that is required? I think at a minimum you would have to bring in some sort of books and records for your business. Here, though, there was no documentation at all in many of these cases. That results in an understatement of tax liability because the taxpayer would be able to claim an earned income tax credit. And as to materiality, Your Honor, this was one of the issues at the heart of the DOJ-IRS investigation. I understand that, but I'm just trying to understand what is the kind of, when it says no proof of business existence, what are we actually talking about? And in particular, I hear what you're telling me, and that's very helpful, if I'm determining what I think about this case and who should be believed and what should happen on the merits. But that's not what we're doing. We're second-guessing the judge, and I'm not clear that there was anything in this declaration that explained exactly what it was that was missing by way of proof of business existence, or that explained that the problem is that there are these specific requirements on tax preparers. And still, it goes further to say whether that is something the IRS says, this is what you need to have in your file, or the IRS just says you need to have something in your file, and we determine what that something should be. And that was missing. And here you have this person saying, maybe not truthfully, maybe it's not really ultimately a defense, but saying, I kept asking what is it that I'm supposed to have, and nobody told me. So, you know, when we're talking about what is a clearly erroneous finding or an abuse of discretion, I have to go on what was in front of that judge. And I don't think you'll find anything in Mr. Delaney's declaration that explains what you just said. Well, Your Honor, I guess two points. One, I don't think there's any real contest that there were breaches and there were errors. I think it goes only to materiality, and I think materiality is shown by the stuff in the record about the IRS lawsuit, which explains that this was one of the issues that the DOJ and the IRS was concerned about, that Liberty franchisees were submitting Schedule Cs with no documentation whatsoever. And so that's why this due diligence was done, that's why these compliance reviews were done, and they found that Ms. Agnew was continuing through her franchises to submit these Schedule Cs with no documentation whatsoever. I think that is a material violation. The only bit of record evidence that the district court pointed to was that Ms. Agnew had said we were picking on, quote, little things. Well, here's another one. On the academic tax credit, this is in paragraph 15, and these are, after all, the auditor's cherry-picked examples that are presumably the best ones, right, that there is a form, 1098-T in the client file, I don't know what that is, but I guess Mr. Delaney does, to support the claim, but box 8, for at least a half-time student, is not checked. Well, I take it you have to be at least a half-time student, right? Yes. So we don't know whether this person was a half-time student or not, or whether this could have been easily corrected by checking with the person. And Ms. Agnew is taking the position that, you know, sorry, we made some mistakes, we didn't check the box. But we should have checked the box because the person is a full-time student, and, you know, there's nothing that says, to me, that that is something that the IRS would come full-bore after somebody, or would ever find out whether the form in the file has that box checked, as opposed to this is a person who wasn't a student at all, et cetera, et cetera. Right, and there are other examples that fit into that mold, where you have someone claiming scholarship, I'm sorry, claiming that they're eligible for this tax credit, but not reporting their scholarship income, which would make them potentially un-eligible. Do we know that there was scholarship income? In that case, I think that there was in the file evidence of scholarship income, but it wasn't reported on the tax form. I'll have to go back and look at that for sure. And again, the question is not, of course, what's the real truth. The question is, does anyone actually say in these declarations that this person had scholarship income, and the file itself showed that? All it said is the person didn't report scholarship income, and there's no real documentation on your side that that is true. Now, I understand at some level, ultimately, the burden is going to be on her, I suppose, to show that if she claims this was Mickey Mouse, she's got to say something about that. When it gets to trial, it's going to be persuasive to a fact finder. But at this stage, you're asking for a preliminary injunction, and it seems to me one reading of this record is there's a certain arrogance. We win all these. We're supposed to win all these. And we know that we've got a good case, but is it really documented in a way that prevents a judge from saying, I'm not sure. I don't think you carried your burden, because she says this is all Mickey Mouse, and I'm not persuaded that it's not. Yes, Your Honor, I think it is more than sufficient, because he gives multiple examples. The Schedule C ones that we've discussed, I think, are the most material, and I think the only debate is whether those are material or not. And I think we had a clear likelihood of success showing that those are material, because they were at the heart of the IRS investigation, as I've said. So even if there are particular examples in the declaration that you may not give as much weight, on the Schedule C examples, I think there's a clear showing of materiality, and Ms. Agnett simply saying that you were picking on small things. Given the history with Liberty, anything that's a problem with the Schedule C is a big deal. Your Honor, it's a big deal because the IRS views it as a big deal. As you know, because they came after you. Correct, Your Honor, and that's why Liberty is taking this seriously and doing these compliance reviews. I see I'm far over my time. Thanks very much. May it please the Court, my name is Jay Ashaiga. I'm associated with the Firm of Borelli & Associates, and I'm here on behalf of Agnett. She is the defendant and the penalty in this matter, and I thank you for your time and consideration on this matter. I think, Your Honors, that this is a very simple case. It's whether or not a preliminary injunction should have been granted or not. And the district court and myself firmly believe that it should not have been granted. They were not able to establish the fact that there was going to be an irreparable harm for many reasons, and I will get into that. And the other is they were not able to show that they would prevail or the likelihood of success was not clear in this case. Judge, can I ask you a question about the way you framed the issue before us? Whether a preliminary injunction should have been granted? Sounds like, in your view, we're reviewing de novo. Or is the question whether the district court abused its discretion in declining to issue a preliminary injunction? Yes, Your Honor. It is whether or not there was an abuse of discretion, but Your Honors have the ability to review the fact and to make a decision based on what the district court said. Well, if we think it should have been granted, can we reverse on that basis? Or do we also have to determine that the district court abused its discretion in concluding otherwise? Yes, Your Honor. You would still have to determine whether or not the district court abused its discretion. Okay. And what exactly do you think is left in this case? That is, assuming for the argument that opposing counsel prevails, where are we left in this case? Where is the district court left? Well, Your Honor, if opposing counsel is able to successfully argue his case today, I do believe that it should be returned to the district court in order to get more information and then, again, assess whether or not a preliminary injunction should be granted. And what do you foresee would be the proceedings on this putative remand? Well, Your Honor, I think there would be affidavits from my client testifying to the facts, and I do believe that there should, again, be oral testimony or testimony in court. But why would that be? I don't fully understand that. I mean, I understand the argument that the district court did not abuse its discretion in making this decision. Then, I guess it goes back to the district court, I suppose. The other side could make a new motion, or I suppose they could just proceed to trial and discovering trial and continue the quest for a permanent injunction. But why would you or anybody else get a second bite of the apple? They made the record that they made. If that's good enough to establish that it's so clear that a preliminary injunction should have issued that the district court abused its discretion, isn't the next step the district court enters the injunction and then you're enjoined pending if you choose to follow it? I mean, I gather you've made an argument that that would be the end of the road for her because she couldn't be in business anymore, couldn't fund the litigation, it would all be over. But as a legal matter, the case would proceed towards whether or not the plaintiff does prevail on the merits. Yes, Your Honor, I do believe that there's still a significant amount of facts that are in my client's favor. But she did testify. I mean, she didn't put it in any declaration, but she did testify. The district court found that was enough. If the district court was within the bounds of its discretion, you win, there's no injunction, at least now. They can then ask the district court if they want to do something else. The judge didn't like our showing, we'll try again. And it would be in the district court's discretion, I guess, whether to grant that. Maybe they'd be better off just pursuing the merits and getting a permanent injunction if they think they're so likely to prevail. But I just don't understand why this isn't the end of the line for the preliminary injunction. Either the district court abused its discretion, should have entered an injunction on this record, you lose, he wins, or the district court was within its discretion, you win, he loses, no preliminary injunction. Where's the remand for more stuff? On the preliminary injunction issue, as opposed to on the ultimate merits of the case. Yes, Your Honor, I think that there were quite a bit more facts. When we get into the minutiae of whether or not the client did actually prepare fraudulent tax returns, incorrect tax returns, I think that they possibly could be more focused on the fact that, one, she did not do that, but also the Liberty Tax, in the contract, they had an obligation to provide support. Yes, the merits of the ultimate case. I guess what I'm thinking, and I wonder about this often when there's an appeal or something like this, this is a preliminary injunction. By taking this appeal, Liberty has given your client more time to stay in business rather than pursuing the ultimate case, and we're fighting here about something preliminary, which, you know, that's why it's kind of abuse of discretion, is this is a preliminary kind of thing. It's not the win or a loss, and we're spending all this time trying to decide, they've got a right to have us decide, whether this was an abuse of discretion. If they didn't make their case sufficiently to persuade us that any reasonable judge would have granted the injunction, they failed. No preliminary injunction. Life goes on. If they did make such a case on the record that was before the district court, the preliminary injunction should be granted. And then we go on with the merits. I don't know why you get another chance if we think they already made their showing. I don't see why they should get another chance, really, if we think they didn't. I agree, Your Honor, yes. And I think that, again, the underlying merits of the case are strongly in my client's favor. But, you know, you look at this contract. They've focused on language that says they can cancel you if your client has committed a material violation of any law, ordinance, rule, or regulation, essentially of the IRS, or committed any act that is or could be in Liberty's determination harmful, prejudicial, or injurious to the Liberty brand. You know, they're saying, we got investigated by the government. We're told we need to clean up our act about making sure that we've dotted every I and crossed every T, especially about Schedule Cs. And she made numerous mistakes on Schedule Cs. Now, maybe those mistakes would not amount to a violation of law or the submission of a fraud to the IRS. But isn't it clear that they're in trouble? Doing the Mickey Mouse, fail to check this box, fail to do some little thing that we've asked people to do. That's really a big deal. Yes, Your Honor. I think that there is still the issue that my client contends that she did not submit tax returns to the IRS. It was Liberty Tax who submits them to the IRS. She prepares the returns, gives them to Liberty Tax, and Liberty Tax makes sure it's correct. They submit it to the IRS. The IRS then pays Liberty Tax the return. So, therefore, if there were all these fraudulent tax returns, why was the IRS issuing all these returns and then not going after my client for preparing fraudulent tax returns? Well, I thought what we heard was they, you know, went and corrected the errors. Yes, Your Honor. Now, the other issue, and I think this is very important. The contract requires Liberty Tax to train my client and to... I guess every tax office preparation company has their own way of doing things, and Liberty Tax has theirs. They're supposed to provide her guidance in how she's supposed to prepare the tax returns according to their software program, and they've changed it throughout the years that my client was there. I believe she was there two years. My client contends that that did not happen, that they did not train her how to use their program. In fact, in the record, they didn't even have training manuals for their upgraded systems. So my client and many other tax offices had no idea how to submit tax returns according to Liberty Tax's system. I think that is a breach of the contract, and I think that the district court was correct in questioning the propriety of Liberty Tax's breach or termination of the contract. And I take it your position is that the enforceability of the right to terminate the franchise upon certain occurrences and the enforceability of the post-termination covenant are all conditioned on satisfaction of that training requirement? That's not just a separate claim for damages for failing to terminate? I think that it does question the enforceability of their termination, Your Honor. I thank you for your time. I see that my time is up. We thank you for your time. Mr. Nicholson, do you want to take one minute? You had some extra time earlier. Yes, Your Honor. I appreciate it. I'd like to just start where counsel left off, which is he brings up this argument that Liberty breached Section 5F. That's what he's referring to of the contract. That was never pressed in the district court during the preliminary injunction proceedings. The district court never passed on it. We never had an opportunity to present evidence on it. I think it's forfeited for purposes of this appeal. And I'd also like to circle back briefly to the issue of materiality, because I think that's essentially the only significant issue here. And, you know, a couple points. One, we're on a preliminary injunction standard. We don't have to show we ultimately prevail. We just had to show a clear likelihood that we'd prevail. And I think the district court did abuse its discretion in holding that we didn't meet that burden. Here, the contract empowers Liberty to determine whether there's been a material violation. We put on evidence showing that we had good grounds to do that. We put on the Delaney Declaration, which we've talked about. There's the evidence in the record about the IRS DOJ investigation. And all that's on the other side is a bare assertion that we were picking on, quote-unquote, little things. Ms. Agnew never sought leave to rebut any of the specific findings by Mr. Delaney and the Compliance Department. They relied solely on this assertion that we were picking on little things. And the district court never took that assertion and matched it up to any of the particular violations here that we had shown in the Declaration and said that these issues weren't material. She just accepted at face value this assertion and then said that we hadn't shown a likelihood of success. I think that's an abuse of discretion. She needed to at least conduct an analysis of why this wasn't material with respect to particular violations. None of that was done. It's just a bare assertion. If we conclude that the district court abused its discretion with respect to the irreparable injury determination but not the likelihood of success or vice versa, do we then have the authority to conduct our own new balancing in light of those factors or do we have to send it to the district court, assuming that one of those two we sustain? Yes, Your Honor. I think that if you were to, we need to prevail on all of them. I think that's our burden. I think that we've shown abuse of discretion on all of them. If you were to find abuse of discretion on one but not the other, then I think the other side might prevail. But I don't think that that's the case here because I think there was an abuse on irreparable harm, abuse on likelihood of success. District court never addressed public interest. And as to balance of the hardships, the district court relied entirely on its other findings regarding irreparable harm and likelihood of success. So if you agree with us on those, then I think its finding on balance of the hardship falls as well. Thanks, Mr. Nicholson. Thank you. The ruling of the decision will turn to the related or arguably tandem cases of Jacobson v. Bassett and Roberts v. Bassett. Mr. Harris, what exactly is the problem here? Good morning, Your Honor. May it please the court. Plaintiff is challenging a policy that on its face sets different criteria for access to life-saving medicines based on the race of the patient. And of course, the district court only dismissed the case for lack of standing, but we think that was wrong several times over. So we believe Northeastern Florida Chapter of General Contractors effectively begins and ends the standing inquiry. The Supreme Court's holding is unequivocal. When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than members of another group, a member of the former group seeking to challenge the barrier need not allege he would have obtained the benefit but for the barrier to have standing. The injury is the denial of equal treatment. It's not the ultimate outcome. Well, the question in these cases that you cite, both the admissions cases and the contractor cases, are whether the contractor would have to show, for example, I would have been the preferred contractor if there were not a racial set-aside, which would be a very demanding thing to prove, obviously. But he does have to show that he's a contractor who would have applied, that he is qualified to do the work, that he's eligible for the contract. And the same with the admissions cases. The person who says I was discriminated against doesn't have to show if there were no racial set-aside, I would somehow have prevailed. And schools that purport to do some kind of holistic balancing, I'm not sure you ever show that. He just has to show I was an applicant or even I was going to be an applicant. I want to go to law school. If you were already a lawyer, you probably couldn't challenge the law school admissions thing, right? So it's not just that any white person could challenge the University of Texas Affirmative Action Law School admission program. They'd have to be somebody who's plausibly going to apply for the benefit, right? Of course. And obviously, the COVID pandemic with infection rates and need for treatment is obviously a more widespread type of injury than that. But I think in this scenario, he would have to show simply that he is at risk of getting COVID, which I think it's an accepted fact that we all are. And that at some point he may need treatment. And that's it. And then we believe there's a barrier. Really, any person could – there's no particularized injury here, really. Any person who is not within the categories of preference could have brought this lawsuit. Well, Your Honor, I think the cases are actually clear that just because an injury is widespread doesn't destroy your standing. I think the Bauer case is a classic example of that. In Bauer, the plaintiff alleged that the USDA needed to be regulating beef more aggressively to prevent mad cow disease. There had never been a single case of mad cow disease found in the United States. And this court still held that that increased risk of harm to him was enough to give rise to standing, even though conceivably any person who ate beef in the United States would have had the same type of injury. But that was an important distinction, right? Any person who ate beef. So he did need to allege that he ate beef and intended to continue eating beef. I'm struggling with trying to figure out the analogy, and I know there's not a perfect one. Nobody intends to get COVID. But I guess you're not looking for a limiting principle. You want to say any, any person can bring this to any white person. No, well, you would still have to allege some risk. And again, it is a widespread injury. But again, I think Bauer and the Supreme Court said explicitly that just because it's widespread. Now, again, it can't be. You just said you actually answered my question by saying we all could get COVID. So anybody. Now, of course, anybody who's black or in one of the other protected categories under these regulations couldn't bring it. But any white person could bring it. Anyone who and again, he still has to allege. So, for example, Mr. Jacobson said it affidavit. And in the complaint that he teaches in person at Cornell, which has had it's a university. And despite vaccine mask mandates has had severe outbreaks. And so there's no question he's in the class of person that assuming as we must have the pleading states. This is a barrier that he would be affected by this barrier and incur the equal treatment injury that the court talked about in northeastern general contractors. If I may respond directly to New York's point, because the district court here didn't address this notion that the policy is just voluntary or nonbinding. And the most fundamental problem with this argument is that we see all the time documents that government agencies issue that say this is a guidance. This is a recommendation. This is an advisory. This is a F.Y.I. bulletin. But none of that is present here. There are none of the sorts of disclaimers or caveats or qualifications that you would see in something that's a truly advisory document. And in fact, it's on formal letterhead. It has the governor and commissioners name. And we said in our brief, there's a statute in New York that says disobeying a public public health order can result in civil penalties and fines. And so I don't think a doctor that received this extremely formal looking memo would think it was anything other than a directive. And it uses words like adhere, prioritize, prioritization. These are not words of advice and suggestion and recommendation. These are words of mandates and regulations and binding obligations. And so how exactly in your view would this system work, the system that you find offensive? How would it work? What's the system classification? Yes. So the way the thing to answer the question directly. So there's a little there's a checklist of things you need to receive oral antiviral. So there's some that are obviously not in dispute. You have to be 12 or older, a certain weight, test positive, have mild to moderate, not severe. But then it says have a medical condition or other factors that increase risk for severe illness. If you are of a nonwhite or Hispanic Latino ethnicity, automatic qualification with nothing further. But otherwise, you would have to show affirmatively this medical condition or other factors. So I think it's basically saying certain groups of people based on race get automatically satisfy this. It's arguably an irrational classification in itself. I'm sorry. It's arguably an irrational classification in itself. I mean, Hispanic covers a lot of ground. We would agree with that, Your Honor. From Bernardo Higgins to Bernita Warren. We would completely agree with that. And in fact, of course, if we got to the merits, one key aspect of strict scrutiny is narrow tailoring. And for example, Asian-Americans who presumably would be lumped in with nonwhite or nonwhite do way better than white citizens on measures of COVID hospitalization. And so this is not even close to narrowly tailored if we got to the merits here. And do we know anything about how this system of classification was created? I don't have that on the record. I'm not sure it's relevant at this point, but I'm just wondering how it came to exist. We weren't aware. I do think it's notable that two other states, I believe Minnesota and Utah, initially put out something that looked very similar and then immediately rescinded it. And virtually all the other states, they list the criteria. They say here are the objective medical criteria that physicians should look at in prescribing oral antivirals in times of shortage. And they're race neutral and everyone is treated equally. And again, we would say if we were able to litigate this on the merits that strict scrutiny is a very tough standard and the burden would be considerable on the state to show tailoring. But those are the merits. Yes, of course. One thing I'm interested in at this point is how was this supposed to work? How did this work in terms of actual distribution? Because these are guidelines that the whole system is only implemented when logistical or supply constraints make it impossible to offer the therapy to all eligible patients. So where and when did that ever happen? I don't have that in this record, Your Honor. Is there any indication that it ever happened? That is to say that a provider, and I think we have to be at the level of a doctor, right? I'm not sure how the doctor is supposed to decide whether there is a supply shortage such that it is impossible to offer this therapy to everyone. Here's a patient who is suffering. The doctor thinks that Paxlovid will do that patient good. What is the doctor supposed to do? I don't have that on this record other than to say I do think it is undisputed that there was absolutely a time when there were real shortages. There may have been shortages, but the shortages, I take it, are nationwide. We've got all these people getting COVID nationwide. We've just approved this drug and there's not a lot of supply. Within a matter of weeks, right, there was enough. So during that period of the weeks, I'm a doctor in whatever, some small town in New York. I've got this patient, happens to be white. I don't have any other patients that have COVID. White, black, old, young, whatever. This is the guy that I'm prescribing for at this moment. Am I not allowed to write a prescription for that person? It sounds like the one thing that's crystal clear is that under this document, in JA-20, the doctor would have to do a more searching inquiry for the white patient. What is their searching inquiry? The question is, I know I call up Charlie Duck down at the pharmacist and he says, yeah, I got some pills. Is there a run on that? Is there a million people down there? No, there's nobody here at the moment. Why can't the doctor prescribe the drug? In that situation, it sounds like they could, but again, I'd also reiterate that. Does the doctor have to call the pharmacist first? Does it say anywhere that you have to check and see? Or is it the fault of the pharmacist then at some point? Okay, now a different scenario where I think you might have an issue. We're at a hospital. They've got their own pharmacy. They've got their own supplies. I understand with respect to, for example, ventilators. They were making literal life and death triage decisions every day because there are only X ventilators and there are two X patients who, at least in principle, could benefit from the ventilator. Now we're in real up against it. Is there any allegation that there was any hospital ever anywhere in New York State that had not enough Pax Lovid to go around and had to apply these guidelines? I'm not aware of that on this record. We're talking about, as we often are in these standing situations, very distinct situations. I got in trouble with the Supreme Court once for over-reading Bauer or for relying on Bauer in case they didn't think it was similar. We look at the particular circumstances, and you're asking us to invalidate a policy that was probably in effect in some way for a period of a certain number of weeks in early 2020 without any evidence that it ever actually got applied to anyone at all. Well, maybe the best way to answer that is if it was completely irrelevant, it seems unlikely they would have issued. The Department of Health must have thought that there would be these situations where doctors would have to be prescribing based on scarcity criteria or else this whole exercise would have been pointless. And I don't know why we would have needed this in the first place. And so I don't want to ask questions. I take it they're saying we've got to be prepared. We've got triage problems here. We are living through the thing with the ventilators, and now we've got this new drug, and we don't know how many pills are going to be there. I'm sure they thought it mattered. But now we're being asked years after the fact, and I understand I'm not getting into the technicalities of mootness either. We're being asked to adjudicate the constitutionality of something that they did in an emergency that, for all we know, didn't actually affect any single human being, let alone your client. Well, again, when you – under northeastern Florida contractors, it is the – all you need to plead is that this thing you're challenging might make it more difficult. Was there any dispute but that the policy was – we had contracts for construction. Some of them were set aside for minorities. People who were white who were contractors knew that they're not eligible for a certain percentage of these contracts that actually exist, and that goes on indefinitely into the future. That's a very different situation, it seems to me. You're relying – you're doing what lawyers do all the time. You're picking a line out of the case that says this is the standard, and now we've got to apply that standard from this case to a case that's actually quite different. Well, it looks more similar to Grutter, though, where – or, I guess, Grath – or, yes, Grutter, where it claimed to be a holistic race is considered at some points and others, and that sort of looks like this also. And you needed to be an applicant, and the person who applied was an applicant. You needed to be an applicant, but you also – I'm struggling with trying to make analogies work here to the existing cases that we have. And in the contractor's case, to make an analogous, you'd have to say, under the following set of circumstances, which may or may not come to pass, and we will set aside. But we don't know yet – we're not at the point where those circumstances have come to pass, and the set-aside is actually coming into play. There's an intermediate set of contingencies, and is that just an empirical evaluation of how likely they are to come to pass, or is the mere possibility enough to get your – I think Bauer gets us there, and I think COVID is different. I mean, my friends cite the MGM case heavily, but that's a classic example where it was a challenge to a Connecticut casino law that set aside – or gave some preferences to Indian tribes. And the – it was held that MGM had no plans whatsoever to actually build a casino in Connecticut. And so, by no standing, they couldn't say we were – we faced hostile business climate because of the law. But with COVID, again – and we said, again, it's outside the record, but Jacobson did, in fact, get COVID, as virtually all of us have at some point. And this is not a speculative possibility. In Bauer, what was interesting to me is a fairly robust discussion between the majority and the dissent about data and likelihood and other things. And so, I guess I'm wondering whether that signals the framework that we ought to be doing, not to say, oh, it's possible, therefore there's standing, but exploring the data to try to figure out the likelihood. And I think that's a great point, because I think when you look at the state's arguments, they look a lot like Judge Cooler's dissent in Bauer, which, of course, is a dissent that said this is all too speculative. We have no idea if he's going to eat – buy beef that has mad cow and get sick. And so, again, we think with Bauer on the books, combined with northeastern Florida general contractors, we think that gets us all the way to standing here, and we'd urge the court to reverse. Thanks very much. Do we have the same counsel arguing both of these cases, or are we going to have other counsel? Different counsel, Your Honor. That's fine. May it please the court, Beasley Kiernan for Commissioner Bassett. The district court correctly dismissed the Jacobson complaint for lack of standing, and this court should affirm plaintiff lacked standing because he has failed to allege any actual or imminent, any concrete or particularized injury. Instead, he relies on a chain, an attenuated chain of possibilities which have not yet come to pass, chief among which there is no shortage of oral antivirals. On its face, the guidance is prioritization framework, which is only suggestion. It applies only during times of shortage. Okay, but there will be, right? Every time there's a new vaccine, every time there's a new antiviral, there's a period in which it exists in less than a sufficient quantity to address the whole population. I mean, are we really going to ignore the ebbs and flows of COVID in looking at the data here? It's possible that there may be a shortage of Paxlovid and Molnupiravir, the two antivirals. There was a very, very significant shortage in December of last year. Right when these drugs were authorized, it coincided with the peak of the Omicron wave. If there is another shortage of Paxlovid, there will be plenty of warning. We'll see a variant coming. We'll see supply issues arising. But there's no reasonable expectation of a shortage at this point. I don't think that would apply to new antivirals. It only applies to the Paxlovid. If there were new antivirals on the market, I would expect the UH to issue new guidance about those antivirals, absolutely. Well, that goes back to another question. So these guidances, and there are two, you're representing the state or you're also representing the city for this purpose today? I'm representing the state. The city has separate counsel. Okay, but they're not here to argue on this case. Not on this case. Okay. But these policies, have they been revoked? No, right? The policies have not been formally withdrawn, no. They still exist, but there seems to be no real factual dispute that at this moment they have no application to anything. That's right. And so again, just to make sure I understand your answer to Judge Robinson's question, but these are not general triage policies for all what are called under something called the PrEP Act and federal law countermeasures. This is about these specific drugs. That's correct. And you're suggesting there is little prospect of a shortage suddenly coming upon us with respect to these drugs? At this point, there's no expectation of a shortage. But if there is a shortage, your view is that the state has effectively stated its intention to distribute, and on how it will distribute medications. Is that right? Well, the state is not distributing antivirals in the same way that it distributed the vaccines, for example. The state did control distribution of the vaccines. Here, any pharmacy can request tax-loaded or monetary review, is my understanding. Why this provision or this advice, whatever, well, how would you characterize the race question in these cases? It is advisory. It advises physicians as to the eligibility criteria. Based on race, in part. Based on evidence that non-white race, Hispanic ethnicity are risk factors for severe disease, and the CDC's recommendation to consider race and ethnicity as well. Yes. The guidance was just that. A little unusual, isn't it? In the health field, I would have thought. I mean, you're not troubled in any way by this? I don't want to. Let me put it to you in the most direct, obvious sense. I come from a part of the world in which so-called Hispanics or Latinos come in every variety, including what you might regard as Chinese, or to take a simple example, the great Cuban patriots of the 19th and early 20th century have the distinction of being what you might call white and others may call, and in the case of Antonio Maceo, famously black, and a third grade figure who was mixed race. How would they fit into this topology? First of all, this is non-binding guidance. So why is it there at all if it's not binding? It's to advise physicians of evidence that non-white race and Hispanic ethnicity, in the United States at least, do... What is it that happens to these Hispanics upon arrival in the United States that makes their health situation different from that of other people? Well, at this point, as time passes, the scientific community absolutely may be able to discern underlying factors, and those factors may take the place of race and ethnicity. But at this point, the evidence in the record suggests that even controlling... This is a particular agency, right? The New York State Department of Health. This is the guidance that they're interested in. How could you not imagine that that will be their advice if the situation were the same again? If there were a supply shortage, I would expect DOH to issue supplemental advice. Just as in March of this year, DOH stated that there is no shortage. Physicians should consider all treatment options. If there is a shortage in the future, it may very well be the case that this framework continues to be the recommendation of DOH, or DOH may maintain it. I think it's not so unusual that there are ethnic factors in connection with certain diseases, right? Tay-Sachs disease, I understand, is more prevalent among Ashkenazi Jews than among other people. Sickle cell anemia is more common, significantly, hugely more common among people of African descent, right? And I don't know whether there ever has been or would be a shortage of supply of tests for these things. But even some of these tests are intrusive, maybe even dangerous to perform. It would not surprise me if there were guidance of some kind, either from the government or from experts, saying the standard of medical practice is you don't test for Tay-Sachs on every pregnant person. Anybody who has certain symptoms that might be consistent with sickle cell anemia, you don't do a test for that unless the person is some African ancestry because it's too risky, too expensive, maybe there's even a shortage. But all that goes to the merits of this unusual and what kind of science do you need and why are we even... You know, what's the prior question? When you're doing the research, why do you put a category of Hispanic rather than something more nuanced? And then you find out that the people who fall into this category of Hispanic, however artificial it may be, maybe just by self-designation, wind up having worse outcomes than people who... By self-designation? Yeah, I mean, the underlying science could be weird, too. Yeah, can I follow up on that? Because I think you said something a second ago that they may be able to isolate the variables, suggesting that this categorization is expanding for other factors. And at least as I read the ANA brief, there's extensive evidence that the fact of belonging to these categories in and of itself is an independent fact that points in the direction of worse outcomes so that you have two people, for instance, both have diabetes. The data tells us that the African American with diabetes is at significantly higher risk for worse outcomes even though they're both in the same box. And I guess I'm just wondering whether you adopt the sort of medical reasoning that we see in the ANA brief or whether you take a narrower view that in this construct race that they stand in for something unidentifiable. Well, first, I just want to make clear the reason we're considering risk here is because Paxlov and Maldapiravir are only approved for those at high risk of severe COVID-19. Generally, you're not considering risk factors for whether you're prescribing medications, but here you do have to consider risk factors. Absolutely, the ANA brief makes very clear why some of these inequities are there. For example, African Americans and Hispanics experience higher rates of undiagnosed medical conditions. Of course, the ANA would say they're not inequities. They would say that they're medically-driven standards to create equity. Sure, absolutely. Long-standing stress, for example, contributes to poor health outcomes and to the extent racism causes stress. That's another reason why non-white and Hispanic people might experience a higher risk of severe disease from COVID-19. But what you're suggesting, it seems to me, and let me see if I can clarify this, what you're saying, one answer is we don't really know. That is, based on the research that's been done to date, when you factor in all of the other things that we already are factoring here and control for those, outcomes are worse for people who are classified in the study by whatever means, as black or Hispanic, even if you control for all of those. But of course, you can never control for everything. And so I suppose as science marches on, you could do studies of only African Americans and then try to figure out, well, let's just try gum disease. I mean, that has been linked to heart failure, so maybe it's linked to bad COVID outcomes. And lo and behold, it does. And it explains all the variation, that if you're black but have never had gum disease, you're equivalent functionally to somebody who's not black. But if you did have gum disease, and then we test that on whites, it turns out that actually for whites, too, this is a factor. And so now we have a race-neutral factor that would explain everything. That's just a function of how much science we've got at any given moment to figure out what the... We have a hypothesis about stress or whatever. Maybe we haven't tested yet, really, to see whether minority folks in low-stress occupations and whatever with relatively lower stress than most other people, even taking racism into account, turn out okay, and we could quantify the stress. But all that is an empirical question based on what goes on. And all of that is an empirical question that seems to me to go to the merits and not to the standing problem. Of course. And if the court does find standing and that the case is not moot, the court should remand so that the district court may address the preliminary injunction motion in the first instance. But if I may answer your question briefly on the merits, this is still a very new disease. It's only a few years old. And racial disparities do persist even when controlling for comorbidities. That evidence is in the record. For example, 184 of the Jacobson Joint Appendix shows that Native Americans, Black Americans, and Asian Americans face longer hospital stays and a higher likelihood of ventilator dependence. Page 195 of the Joint Appendix suggests that nonwhite people experience higher mortality rates even controlling for educational attainment. Again, all that goes to the merits, but I urge your honors to affirm for lack of standing because plaintiff has failed to show any actual or imminent injury that is traceable to DOH and redressable by a declaration that the guidance is unconstitutional. Thank you. Thank you very much. Full reserve decision. And you're up again. Just a couple quick points. I'll be very brief. So Judge Robinson, on this question of there's no shortage note, GA45, their own witness, says supply chain disruptions can happen at any time. We've all known this over the last few years that as things spike and supply shocks happen, that that's obviously not speculative that that could happen again. The policy is absolutely in effect and the department has never argued otherwise. And now on this question of... How do we know that it's in effect? Well, they have not rescinded it. And the item attached to their brief in this court that suspends it. It says there is no shortage, but that document remains what will happen if there is a shortage. Now, on the gross disparities, it is, we see from the Supreme Court again and again, it is very dangerous to be giving out benefits or burdens based on people's rates. This is the merits. Do you really think we're going to issue a preliminary injunction on our own authority based on our own assessment of the merits that have never been assessed by any district judge? We're really focused here on... And it's a very, you know, that's got its own set of problems. It's hard enough to deal with the standing, frankly, and mootness issues because, you know, for example, one question here that's been asserted, and maybe you agree with this, is that this guidance is about paxlovid and one other drug. There is no shortage now, but hypothetically there could be. Is that basically your position? Are you arguing that it's not just that, but the next new drug to come along, they're going to issue the same guidance? You're not arguing that that would give you standing, right? We haven't raised anything like that. We're focused on this guidance about these drugs, and you are saying that it's still in effect and there's certainly no guarantee that there won't be shortages in the future. Yes. And so the question is how speculative is speculative, how concrete is concrete, at least as we look forward. Then let me, if the last thing I could say is to answer Judge Koubranis' question, why is this there at all if it is voluntary? What they could have done, if there are these disparities that the AMA and the EPILES and others acknowledge, publish them, talk about them, tell doctors to be really careful to make sure that as you're treating people for COVID, you're treating people fairly based on race. That's the way you educate and you address this, and you do it in a race-neutral way that doesn't involve a policy that on its face appears to tell doctors to give... I'm sorry, what if they think this is the best policy? I mean, you're saying they should have said, take this into account, be careful about this. But of course, that's sort of like these non-quota affirmative action things, isn't it? Wouldn't the logic of your position be they shouldn't say that? They shouldn't say be more careful, be more worried when you're dealing with someone who's African-American. I think there's a meaningful difference, and again, not to get into the numerics, but just to respond to the question. I do think there's a meaningful difference between saying make sure you treat everyone fairly and equally versus criteria that say prioritize in this way and race is the first one. I'm just focused on the question of you said why would they give this guidance if it weren't sort of mandatory? But then you said they should have given some other kind of guidance, which also wouldn't have been mandatory. I'm not sure what the difference is. If the question is, is it mandatory or not, what's the difference between saying before you give Pax Lovett out to anybody, read this article by Drs. Jones, Schwartz, and Simpson that happens to be an article that says we've got way worse outcomes for minority people. That would be okay, but summarizing the results and saying we really should prioritize these people is a difference? It's never been disputed that education, publication is a meaningful difference than what this says is prioritization. Well, but it's still what they're saying is how we think you should prioritize. And I'm just having a little trouble saying why is that so quasi-mandatory as opposed to an educational program that is labeled an educational program that basically says the same thing by just pointing to this article and that article. I don't think anyone, Your Honor, would think that that carried the force of law, and I think virtually anyone who saw the documented issue here would think it did. And does anyone, and to get back to the question of how this operationalizes, who is bound to do what when facing your client? If your client came down with COVID not in Massachusetts but in New York, and it was during a period when there was still a perceived shortage, and he walks into the doctor's office, is the doctor required slash forbidden to do what? They seem to envision a fairly reticulated process that includes race at every step. In the second document, the one from December 29th, it even talks about counting up the risk factors, and of course race is a risk factor, which means that it will always be. But the question is, this is a triage document. How does the doctor know whether he or she is in a triage situation? Other than that nationwide, probably somebody is. But if I can write a prescription for my patient, or if I as the pharmacist can say, I got five doses of this stuff here, you're the first guy to come in. Thanks very much. We're going to hear counsel in Roberts against Bassett, 22-622. Here's the font. Thank you, Your Honor, and may it please the court. One thought for plaintiffs Jonathan Roberts and Charles Arushka, who are here with us in the courtroom today. Plaintiffs seek equal access to potentially life-saving COVID-19 treatment. But New York City believes that a race-neutral system for distributing COVID treatments would be tantamount to racial discrimination. In December, the city directed medical professionals to follow the state's directives and to use race as a factor in allocating treatments. The plaintiffs in this case, like the plaintiff in the last case, have standing to challenge the state's directives. But unlike the plaintiff in the last case, the plaintiffs here are lifelong New York City residents. So they also have standing to challenge the city's directive and a viable claim against the city for nominal damages. Plaintiffs here are therefore entitled both to prospective and retrospective relief. They are entitled to prospective relief because the state represents the challenge directive, has not been superseded, and acknowledges that supply shortages can occur at any time. Why do you claim, as I think you do, that there's a reasonable expectation, quote-unquote, that the guidance will once again come into effect? Well, I think we claim that because of what the state has said in their declarations, that the directive has not been superseded, that the supply shortages can happen at any time. If you think about it... Well, again, excuse me, I think that Judge Garance's question was sort of a reasonable expectation that it would. Or do you think that's not the standard? Do you think the standard is, as you sort of just phrased it, if it is possible that at some point in the future supply chains could break down or there could be another temporary shortage, if that is a possibility, is that enough for standing? Is that your position? Well, it's not merely possible, Your Honor. I think it is a reasonable expectation because we're talking about COVID here. So, it's a reasonable expectation that it will happen, that there will be a shortage of Tax-COVID in the future? Sure, Your Honor, and I think we have much more of a reasonable expectation in this case compared to the plaintiffs in Bauer that he would contract, you know, mad cow disease. Here, we're talking about the coronavirus pandemic we've seen in the past two years. Unexpected, unforeseen variants, unforeseen supply shortages, unforeseen lockdowns. If we're talking about the injury being an exposure to a risk, which is, I gather, your contention, the plaintiff in Bauer, there's a very high likelihood that he will consume meat, which is what he contends creates the exposure to the risk. Here, what creates the exposure to the risk is a combination of shortages in drugs that are now plentiful on the market in the particular place where an individual, where one of your clients then also gets sick and is deprived of the medication on account of... I don't know if you get sick here. They have to get sick, and therefore they're competing on a level playing field. But there is this intermediary contingency that doesn't exist in Bauer. That's why I'm struggling with that analogy. So I don't think there is, Your Honor, because in Bauer, I mean, Your Honor asked about the number of people who could be affected and who have standing, and I think the number of, you know, white residents who are otherwise eligible for these treatments, that tells in comparison to the number of plaintiffs, possible plaintiffs in Bauer, which is meat eaters, American meat eaters. And I think the fact that there are many people with standing here goes to the fact that this is COVID, which, as we've learned in the last two years, can affect millions of people at once. But you also need the shortage, right? So even if we grant you that COVID can affect everyone, the policy doesn't come into play until you also have a shortage. What's the analogy to that in the Bauer case? So we do need a shortage, and I think the proper analogy, you know, you can talk about Bauer. You can also talk about cases like the Jacksonville, City of Jacksonville case, Associated General Contractors case, where, you know, the court didn't really look at this particular contract or that particular contract that was going to be bid on. It just looked at, overall, there were going to be contracts with racial preferences, and those preferences put the plaintiff there and its members at an unequal playing field. But it was certain there would be contracts. Sure, and I would say here that the state itself expects there to be shortages. No, no, no. What you quoted the state as saying, and I'm not sure if maybe this was your misspeaking, was there is a possibility. There is always a possibility, is what you quoted them as saying. Now, maybe they said something stronger, but there's always a possibility that we could be invaded by space aliens. It could happen. We don't know. We don't know whether there are space aliens or there aren't. It's possible. Now, I grant you that's outlandish. This is probably not outlandish, but the question of how likely does it need to be on a going-forward basis. I mean, more likely than that Mr. Lyons might have another encounter with the police where they used a chokehold? Your Honor, in Lyons, there was no official policy here. There was an official policy from the state side and the city side. So you're predicting what's going to happen. I don't think that we need to make any more of a prediction in this case than, of course, in the education admissions cases where there's no guarantee that race will be a factor with regard to any particular applicant, but regardless, because race is used in admissions decisions, those cases, regardless of the merits, they come out different ways on the merits. But you still have to be an applicant, and there are lots of people who are applicants, and there are many people who aren't. But what we're talking about here, it seems to me, is something that does feel very speculative if what we're saying, at least on the future look... There's a different question with respect to what happened in the past, but with respect to the future and injunctive relief, how likely does it need to be that there will be shortages of these particular drugs in the future in order for you to have standing? What is your view of it? Because I don't know if there's a clear... What is even the formulation? Reasonable likelihood? Reasonable certainty? Probability? Some likelihood? Mere possibility? What is it? So I think we have claims for retrospective and prospective relief here. I'm asking about the prospective for now. Right, Your Honor. So for prospective relief, I think it has to be a reasonable likelihood. And I think what your question gets at with sort of the applications in the education and admissions cases is this line that the Supreme Court has drawn about individuals who are willing and able to compete for the benefit. No, no, but we're talking about the likelihood of the shortage here. Right. And so the question is what... I'm just trying to figure out... You said, okay, reasonable likelihood. Is that something that they admitted? Or is there some expert on your side that says there is a reasonable likelihood? If that's the standard, I don't know if it is, but that's the language you picked of the range for now. Is there somebody who says reasonable likelihood? Well, this was dismissed at the pleading stage, so we don't have experts in this case. But I think you would get the reasonable likelihood. What is the allegation? The allegation is that COVID is an unpredictable pandemic. Supply shortages, supply chain disruptions can occur at any time. And the government itself... Can occur. And the government itself says what about it? The government itself acknowledges all those acts and has not rescinded the prior directive in response to direct questioning from the district court. And if the government didn't expect the shortages to occur in the future, I think it raises a question about... Why not rescind it? Correct, Your Honor. Thank you. I'll reserve my time. Thank you, Your Honors. I may have pleased the court. You're getting the state again, and then you'll get the city. This is Andre Atrenzo from the Office of the Attorney General. Well, Mr. Atrenzo, why don't we pick up right where we left off? Yes. Why do these things still exist if there's no reasonable likelihood that this is ever going to happen again? Why not wait until it does and then see whether at that time the science is different or better and issue new guidance? Well, the guidance itself has been... It is not being applied for that very reason, Your Honor. There is no shortage right now. There's no expectation there'll be a shortage. No one's predicting that there'll be a shortage. Of course it's always possible that there's a shortage, but the guidance... That aspect of the guidance that directs prioritization in times of shortage is just not being applied on its face. Well, let's go back to this question of why it's still there. Why create undue anxiety among members of the community, substantial numbers of persons in the community, by having that there? That there is provision which appears to suggest the distribution of medicines of some kind on the basis of race. Well, it was there, Your Honor, because there was a shortage. And so... We understand that. Yeah. So you say there's no shortage now. Correct. So you're prepared to rescind this guidance? Well, the guidance hasn't been rescinded. I can't speak to what the department... what was going through the mind of the department when it made a determination whether to update it as opposed to rescind it. But I suspect... I don't know what the answer to that is, Your Honor. I know that what the department did was make an announcement that that aspect of the guidance that says this prioritization is to be applied in times of shortage or supply chain limitations is no longer in effect. The physicians are encouraged to explore all treatment options as early as possible. Can we go back, then? Mr. Fott didn't get to it, but he did make the point that he's challenging not only going forward, standing to get injunctive relief, perhaps, he's also raising the question of standing for some form of retrospective relief. And you just said, well, this was in effect for a period of time. Now, I take it none of the plaintiffs are able to establish physical damages because they either never got COVID or they got drugs or whatever. No one's saying that... No plaintiff is saying that he or she got... was denied the drugs. But I'm sure Mr. Fott would suggest that nominal damages could apply if this policy was in effect and was illegal, even if no one has found a plaintiff who could actually claim to have been physically harmed by it. So what's wrong with that theory of standing at least looking retrospectively? Well, Commissioner Bassett has been sued only in her official capacity as an officer of the state, and so any claim for damages against Commissioner Bassett, nominal or otherwise, is barred by sovereign immunity, and so the court lacks jurisdiction over that claim for that reason, for that independent reason. And so with regard to nominal damages, that is just not something, with regard to the state at least, that the court really needs to trouble. So they're only suing... Well, I guess I'll have to hear from the city, then, is what you're saying. I can't speak for the city. On nominal damages. That's correct. And if I could address the question that Your Honor's raised about how to try to tie Bauer, analogize Bauer to this case, given the fact that we're not in a supply chain shortage right now. And I think, I mean, this is a thought experiment, so I don't know that, you know, it requires a little bit of creativity, but I think it would be as if in Bauer the prospect of mad cow disease would suddenly no longer be extant. It's no longer the case that this disease is circulating among the cows in England or wherever. It may come back, but we don't know. For now it's not. And so that would be the analogous situation. You have a plaintiff suing on a hypothetical maybe this will one day return again. I may one day again be exposed to this disease by consuming this meat, but he's not right now. And that's the case we have here. So unless the court has any further questions. Thank you. Oh, yeah. Sorry. Always happens to me. Good afternoon, Your Honors. May I please support Diana Lawless on behalf of the city. So I just want to make sure Your Honors are aware of what the city did here. So the city's advisory is on JA 4242. The city advised clinicians to adhere to the state's guidance on prioritization during the time of severe resource limitations and should consider race and ethnicity when assessing a risk among those things. So I think when it comes to standing with respect to the city, I know, Your Honor, Judge Lynch, you wanted to talk about nominal damages. I think that any claim here of concrete and particular injury is still speculation piled upon speculation. I think the Supreme Court has said recently in the Yusef Gabon case, nominal damages have to be for redress for a completed violation of a legal right. I think that they would have had to have suffered some sort of damage. They would have had to have contracted COVID during the shortage period for liability to attach. And I also think that applies to prospective relief because I struggle, as Your Honors have struggled, with the application of the barrier test in the city of Jacksonville test. And there, as Your Honors have discussed, the contractors were ready and able to bid on contracts. The contracts were always going to exist. There was a city policy that created the barrier to the access to the contracts. Here, there's plenty of factors that were beyond the city's control to prevent the plaintiffs from identifying any injury. I think any barrier case, every barrier case, the Supreme Court has found, has had a centralized and binding government process. Here, this is a decentralized process. There's innumerable healthcare providers, mostly private actors. The city advisory is non-binding, and we put in, Judge Cabranes, you may be interested in looking at this about why we did this. The Morris Affidavit from our chief health officer, she explained that we did it, we did it to follow not only the state guidance, but also to raise, the reason we did it was to raise awareness that this could be a factor. It's not a mandate. The city would not have taken any enforcement actions against anyone for not following it. The city had no way of tracking anything. There's no matrix. There's no point system. All it says is, among other factors, one should consider race and ethnicity. In fact, hearing from plaintiff's counsel in the other case, the Jacobson case, when he said this is an FYI bulletin, and everything he said on reply, in his rebuttal argument about, well, you know, if they had just said consider this as a factor, I think that's what the city's policy did here. The city's policy uses imperative words. It says...